J-A04037-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GREGORIO ORROSTIETA | : | |
| | : | |
| Appellant | : | No. 1686 MDA 2016 |

Appeal from the Judgment of Sentence July 27, 2016
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0001507-2015

BEFORE:   STABILE, J., NICHOLS, J., and RANSOM*, J.

MEMORANDUM BY RANSOM, J.:                    **FILED MAY 02, 2018**

Appellant, Gregorio Orrostieta, appeals from the judgment of sentence of twenty to forty years of incarceration, imposed July 27, 2016, following a jury trial resulting in his conviction for murder of the third degree.[1]  We affirm Appellant's conviction, but we vacate the judgment of sentence and remand for resentencing in compliance with 18 Pa.C.S. § 1106(c).

The following factual and procedural history is garnered from the record.  On January 25, 2015, Karli Hall, the decedent, fractured her orbital bone while in her dormitory room at Millersville University ("Millersville"), where she attended school.  Notes of Testimony Trial (N.T. Trial) at 514-23,

_____

[1] 18 Pa.C.S. § 2502(c).

_____

*   Retired Senior Judge assigned to the Superior Court.

1205, 1268-73, 1292-93. She had been drinking alcohol earlier in the evening and did not recall how the injury occurred.

On Thursday, February 5, 2015, Appellant travelled to Millersville to visit Hall, his girlfriend, and he stayed all weekend. Trial Court Opinion (TCO), 12/7/16, at 6 (N.T. Trial at 440, 447-50, 460, 602-05). After spending Saturday night drinking, they had an argument and returned to Hall's dormitory room.

At 5:22 a.m. on February 8, 2015, Appellant called 911 and said Hall was unresponsive. *Id.* at 4 (citing Commonwealth Exs. 1-2; N.T. Trial at 305-07, 351-52). When police arrived to Hall's dorm room, Appellant was standing over Hall who had dried blood over her face and body. Appellant's sweatshirt was ripped half-way down, exposing red scratch marks on his chest. He had scratch marks on his face, a cut on his forehead, and blood on his hands and pants. Appellant smelled of alcohol, but he spoke clearly and was responsive to questions.

An autopsy by Dr. Wayne Ross revealed that Hall had defensive wounds, a skull fracture, internal bleeding, and thirty-nine different areas of external trauma and that her chest was compressed back to the spine. Hall "drowned in her own blood while being suffocated"; her cause of death was strangulation and multiple traumatic injuries. The manner of her death was homicide.

Prior to Appellant's trial, the defense revealed that it intended to present the testimony of forensic toxicologist Gary L. Lage, Ph.D. According to Appellant, Dr. Lage would testify about the correlation between alcohol intoxication and violence, alcohol-induced amnesia, how alcohol distorts perception, and the effects of combining alcohol and caffeine, and he would provide a "retrograde extrapolation" of Appellant's blood alcohol content ("BAC") at the time of the incident. Appellant further maintained that Dr. Lage would also testify that Hall had BAC of 0.166% at the time of her death and that people with a BAC between 0.1% and 0.2% experience disorientation and the inability to control emotional and physical reactions to stimuli.

Dr. Lage's report included the following statements:

[Appellant] indicated that he slept on the floor and woke up at about 5:20 am and could not awaken Ms. Hall. . . . [Appellant] indicated that Ms. Hall attacked him with a pencil, striking him in the forehead. He said he backhanded her and she fell striking her head in a chair. After that, [Appellant] indicated he has no memory until finding Ms. Hall later that morning. It is unknown what [Appellant]'s blood alcohol level was in the early morning hours of February 8, 2015, but he was consuming alcohol at the same party as Ms. Hall, and he has indicated that he has a poor memory of the events that morning.

Dr. Lage's Report, attached to Appellant's Brief as App. "B", at 4-5.

The Commonwealth filed a motion to preclude Dr. Lage's testimony. In Appellant's response to the Commonwealth's motion, he wrote: "High doses of caffeine effects the individual who continues to drink because caffeine diminishes the effects of the alcohol. That's why intoxicated

persons are given coffee to sober up. This is . . . common knowledge." Appellant's Resp. to Commonwealth's Multiple Mots. in Limine, 4/11/16, at 25.

The trial court held a hearing on the Commonwealth's motion, during which Appellant's counsel conceded that Appellant's BAC at the time of the incident was unknown, that there was no accepted scientific methodology to determine whether an individual was suffering from alcohol-induced amnesia, and that the testimony would be used to bolster Appellant's credibility by suggesting that he could not recall the details of the killing based on alcohol-induced amnesia. The trial court granted the Commonwealth's motion.

During Appellant's jury trial in April 2016, multiple individuals testified about arguments between Appellant and Hall in the eleven months before the incident. Evidence from Facebook showed that Appellant had previously physically assaulted Hall, giving her a black eye on one occasion and leaving scratches on her neck from choking her. Throughout the duration of their relationship, Appellant repeatedly asked whether Hall was cheating on him and frequently accused Hall of infidelity.

Appellant offered the testimony of Dr. Peter Speth, who had been retired from practice as a medical examiner for twenty-four years prior to trial and whose New Jersey medical license had been suspended between 1998 and 2008. Dr. Speth opined that Hall probably died from a fall in her

- 4 -

drunken state that precipitated positional asphyxia, as well as a severe nosebleed caused by re-injury of her orbital bone. Dr. Ross rejected this theory, because Hall's orbital bone was healing, her septum and nose were intact, and she did not suffer a nosebleed.

Throughout trial, defense counsel maintained that Appellant acted in self-defense when, after an alcohol-fueled evening, he and Hall fought, and Hall repeatedly stabbed him in the head with a pencil or pencils. *See, e.g.*, N.T. Trial at 2292-93, 2297. Defense counsel's theory continued that, during the ensuing struggle, Appellant accidentally struck Hall on her previously fractured orbital bone.

After testimony concluded, the trial court and counsel held a conference to discuss the final jury charge. At the conference, defense counsel provided the trial court with a 2007 version of Pennsylvania Suggested Standard Criminal Jury Instruction 15.2501B, "Criminal Homicide Finding Lesser Type," which did not include "progression" language that the jury should first consider first-degree murder, then third-degree murder, then voluntary manslaughter, and then involuntary manslaughter.

> During the charge itself, the trial court instructed the jury:
>
> a killing may be voluntary manslaughter but never murder[, even when] a defendant kills in the heat of passion following serious provocation or when he kills under an unreasonable mistaken belief in justifying circumstances.
>
> Accordingly, you can find malice and murder only if you are satisfied beyond a reasonable doubt that the defendant was not acting under a sudden and intense passion resulting from serious

provocation by the victim or under an unreasonable belief that the circumstances were such that, if they existed, would have justified the killing.

A defendant acts under an intense passion if he acts under an emotion, such as anger, rage, sudden resentment or terror that is so strong that it renders him incapable of cool reflection. A defendant acts under a sudden passion if the time between the provocation and the killing is not long enough for the passion of a reasonable person to cool. A defendant's passion results from serious provocation if it results from conduct or events that are sufficient to excite an intense passion in a reasonable person.

Thus, the existence of intense passion turns on the actual mental and emotional state of the defendant, while the existence of sudden passion and serious provocation turn on how a reasonable person confronted by the same provocation would react.

Remember, you can find malice and murder only if you are satisfied beyond a reasonable doubt the defendant was not acting under a sudden and intense passion resulting from serious provocation by the victim.

The law recognizes the cumulative impact of a series of related events can lead to sudden passion and amount to serious provocation. The test is whether a reasonable person confronted with the same series of events would become so impassioned that he or she would be incapable of cool reflection.

The reducing circumstances of a defendant acting under an unreasonable belief that the circumstances of the killing was justified applies where the defendant actually believed he was in immediate danger of death or serious bodily injury from Karlie Hall at the time he used deadly force, but his belief was unreasonable in light of the facts as they appeared to him at the time. . . . Note that the unreasonableness of the defendant's belief is not an issue here. The question is whether the defendant actually believed such an immediate danger existed at the time he used deadly force, and to prove malice through this element, the Commonwealth must prove the defendant did not actually hold such a belief.

*Id.* at 2386-89.

The trial court also gave the following instruction about finding lesser types of criminal homicide than first-degree murder:

> Now, I have defined the elements of the four types of criminal homicide that you might possibly find in this case. Beginning with the most serious, they are first degree murder, third degree murder, voluntary manslaughter, and involuntary manslaughter.
>
> You have the right to bring a verdict finding the defendant not guilty or finding him guilty of one of these types of criminal homicide.
>
> It may help you remember each type of criminal homicide if I review some highlights. Murder requires malice, manslaughter does not. First degree murder requires a specific intent to kill; third degree murder is any other murder. Voluntary manslaughter is basically an intentional killing for which malice is not proven because of passion and provocation or an unreasonable, mistaken belief in justifying circumstances. Involuntary manslaughter requires a reckless or grossly negligent killing.
>
> To guide the deliberations, you may wish to consider each type of homicide in order, beginning with the most serious grade charged. For example, in this case you may wish to begin with the charge of first degree murder.
>
> . . .
>
> If . . . you find the Commonwealth has not proven all of the elements of first degree murder beyond a reasonable doubt, you must find the defendant not guilty of that charge and go on to consider the next most serious type of homicide charged in this case, that being third degree murder.
>
> . . .
>
> If you find the defendant guilty of that charge, you do not need to consider a verdict on any of the lesser degrees of homicide that I have defined for you, including voluntary or involuntary manslaughter.
>
> If, however, you find the Commonwealth has not proven all of the elements of third degree murder beyond a reasonable doubt, you must find the defendant not guilty of that charge and then

go on to consider the most – next most serious type of homicide, namely voluntary manslaughter.

. . .

If you find the defendant guilty of that charge, you do not consider involuntary manslaughter.

If, however, you find the Commonwealth has not proven all the elements of voluntary manslaughter beyond a reasonable doubt, you must then find the defendant not guilty of voluntary manslaughter and go on to consider the elements of involuntary manslaughter.

If you proceed with your deliberations in this manner, you must remember that at every stage you must consider all of the evidence presented in determining whether the elements of that offense have been proven beyond a reasonable doubt.

*Id.* at 2398-2401. After the trial court completed the jury instructions but before the jury retired to deliberate, defense counsel requested a sidebar and placed an objection to this "progression" language on the record, which the trial court overruled. *Id.* at 2406.

Appellant was found guilty of third-degree murder. In June 2016, he filed a post-trial motion seeking DNA analysis of blood found on a comforter, rug, and blanket at the scene; Appellant's motion was denied. In July 2016, Appellant was sentenced to twenty to forty years' imprisonment and deferred the determination of restitution. Following a restitution hearing in August 2016, Appellant was ordered to pay $14,936.71.

In August 2016, Appellant timely filed a post-sentence motion requesting the court modify his sentence, grant a new trial, or grant a motion of acquittal. In September 2016, the court denied Appellant's post-sentence motion.

Appellant timely appealed and filed a court-ordered Pa.R.A.P. 1925(b) statement.[2] The trial court issued a responsive opinion.

Appellant presents the following questions for our review:

1.    Where all parties agreed that alcohol played a huge part in this case, did the [trial c]ourt err in excluding the testimony of the defense toxicologist?

2.    When the Commonwealth took the position at trial that there was little spilled blood from the victim on several bloody items at the scene, yet changed its position post-trial, was there prosecutorial misconduct where the amount of blood was a critical issue at trial?

3.    Where the [trial c]ourt gave a progression charge to the jury which did not include the main theory of the defense, did the [c]ourt's charge prejudice the defense and should the [c]ourt have granted a mistrial or provided some other curative measure?

Appellant's Brief at 3.

## Expert Testimony

Appellant contends that the trial court erred in excluding Dr. Lage's testimony. Appellant's Brief at 19. Appellant argues that Dr. Lage would have explained the effects of alcohol on violence and memory and the "synergistic effects" of alcohol and caffeine.

Our standard of review for the challenges to the admission of expert testimony is as follows:

The admission of expert testimony is a matter committed to the discretion of the trial court and will not be disturbed absent an abuse of that discretion. An abuse of discretion is not merely an

---

[2] Appellant abandoned a number of his arguments on appeal.

error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

***Nobles v. Staples, Inc.***, 150 A.3d 110, 113 (Pa. Super. 2016) (citations and internal quotation marks omitted).

## No Expertise Required

Pa.R.E. 702 permits expert testimony on subjects concerning knowledge beyond that possessed by a layperson. As we have explained:

> ["]It is the job of the trial court to 'assess the expert's testimony to determine whether the expert's testimony reflects the application of expertise or strays into matters of common knowledge.' " ***Snizavich v. Rohm & Haas Co.***, 83 A.3d 191, 194 (Pa. Super. 2013) (citations to quoted authorities omitted). . . .

> > Admissible expert testimony that reflects the application of expertise requires more than simply having an expert offer a lay opinion. "Testimony does not become scientific knowledge merely because it was proffered by a scientist." Likewise, expert testimony must be "based on more than mere personal belief," and "must be supported by reference to facts, testimony or empirical data."

> ***Id.*** at 195 (citations to quoted authorities omitted). Accordingly, we have stated the following test to distinguish between admissible expert testimony and inadmissible lay testimony by an expert:

> > The exercise of scientific expertise requires inclusion of scientific authority and application of the authority to the specific facts at hand. Thus, the minimal threshold that expert testimony must meet to qualify as an expert opinion rather than merely an opinion expressed by an expert, is this: the proffered expert testimony must point to, rely on or cite some scientific authority—whether facts, empirical studies, or the expert's own research—that the expert has applied to the facts at hand and which supports

- 10 -

the expert's ultimate conclusion. When an expert opinion fails to include such authority, the trial court has no choice but to conclude that the expert opinion reflects nothing more than mere personal belief.

*Id.* at 197.

*Nobles*, 150 A.3d at 114-15.

Here, Appellant's challenge fails, because the effects of alcohol on memory and as a cause of violence do not require expert testimony. This information is not beyond the knowledge of a layperson. Additionally, Appellant has admitted that the relationship between alcohol and caffeine are common knowledge. Appellant's Resp. to Commonwealth's Multiple Mots. in Limine, 4/11/16, at 25. Thus, we find that the trial court did not abuse its discretion in assessing that Dr. Lage's proposed testimony did not reflect the application of expertise but, instead, strayed into matters of common knowledge. *Nobles*, 150 A.3d at 113-15; TCO at 22.

*Inclusion of Appellant's Out-of-Court Statements in Dr. Lage's Report*

Assuming that Dr. Lage's testimony went beyond common knowledge, we consider whether Appellant would have been permitted to present Dr. Lage's testimony in support of his self-defense claim. Appellant contends that, had Dr. Lage testified, he would have explained that, at the time of her death, Hall tested positive for caffeine and had a BAC of 0.166%, which was a level at which people become disoriented and unable to control their emotional and physical reactions to stimuli. Appellant's Brief at 20 (citing Dr. Lage's Report, attached thereto as App. "B", at 3-4, 7-8). The allegation that Hall was irrational and out-of-control was intended to buoy

- 11 -

defense counsel's theory that Hall had violently attacked Appellant and that he had accidentally killed her when he struck out in self-defense, hitting her previously fractured orbital bone. *Id.* at 24. Appellant contends that the trial court "wholly ignored" his argument that Dr. Lage's testimony would not only have explained Appellant's behavior but also would have provided the foundation for "how Ms. Hall acted." *Id.* at 26.

In *Commonwealth v. Towles*, 106 A.3d 591, 604 (Pa. 2014), the appellant argued that the trial court improperly excluded his expert's report and abused its discretion by refusing to permit his expert to testify about all the facts on which he relied in rendering his report. The expert's report contained the non-testifying appellant's narrative of events on the night of murder and his self-reported alcohol and drug consumption. *Id.* at 605-06. The Supreme Court of Pennsylvania held that the trial court properly excluded the expert's report and testimony:

> The trial court did not abuse its discretion in finding appellant's self-serving statements were not of a type reasonably relied on by experts in toxicology. There is a distinction between an expert using basic facts provided by laymen to form an expert opinion, versus one who simply parrots out-of-court statements in court, thereby acting as a conduit for hearsay. In this case, there were no toxicology screens or tests performed on appellant. The expert's report was simply appellant's firsthand narrative of the events on the night of the murder and a detailed account of his drug and alcohol consumption that night. Had the expert been permitted to testify to the facts contained in his report, he would have been merely relaying testimony appellant would have given had he taken the stand. Pennsylvania's Rules of Evidence do not provide a mechanism for a criminal defendant to decline to testify and to avoid the rules of evidence by using an expert witness to introduce his story into the record.

- 12 -

Accordingly, it was proper for the trial court to exclude the report from the jury's consideration and to prevent appellant's statements from reaching the jury via the expert's testimony.

*Id.* at 606.

Here, Appellant also contends that the trial court improperly excluded his expert's report and testimony. Similarly, Appellant did not testify, but Dr. Lage's report repeatedly included Appellant's narrative of events – *e.g.*, Appellant "**indicated** that he slept on the floor . . .", Appellant "**indicated** that . . .", he "**said** he backhanded . . .", Appellant "**indicated** he has no memory . . .", "and he has **indicated** that he has a poor memory . . ." Dr. Lage's Report, attached to Appellant's Brief at App. "B", at 4-5 (emphasis added) (quoted above). As in ***Towles***, Appellant cannot use an expert's testimony and report to slip his story into the record via the backdoor when he chose not to take the stand himself. 106 A.3d at 606. Accordingly, just like in ***Towles***, "it was proper for the trial court to exclude the report from the jury's consideration and to prevent [A]ppellant's statements from reaching the jury via the expert's testimony." ***Id.***[3]

_____

[3] Assuming *arguendo* that Dr. Lage had been permitted to testify, his argument that Appellant was suffering from alcohol-induced amnesia would have been belied by Appellant's own discussion with police. As the trial court summarized:

Appellant . . . initially claimed he could not recall details of what happened the night of the murder until he was confronted by police with details they obtained from witnesses. Appellant then remembered more details but blamed Hall for starting a fight. When asked why he didn't say this earlier Appellant did not blame alcohol consumption but stated it was because he knew it

*(Footnote Continued Next Page)*

**Prosecutorial Misconduct**

In the "Argument" section of his brief, Appellant argues that "the Commonwealth committed prosecutorial misconduct or a *Brady* violation."[4] Appellant's Brief at 35. However, Appellant makes no reference to a *Brady* violation in his statement of questions involved. *Id.* at 3. "No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby." Pa.R.A.P. 2116(a). As Appellant's statement of questions involved does not state or suggest a *Brady* claim, he has failed to preserve this challenge, and we will only address his claim of prosecutorial misconduct.[5]

*(Footnote Continued)* _____

> would not look good for him. Appellant initially claimed he did not hear the RA knock on the door after the altercation, before admitting he did hear the knock but did not answer because he was considering suicide. Appellant claimed that after the confrontation everything got quiet and he next remembered waking up at 5:00 a.m. However, evidence revealed that between 3:14 a.m. and 4:16 a.m., Appellant sat in the room next to Hall's dead body and conducted a [G]oogle search for music, watched a YouTube video, and went to Hall's Facebook page.

TCO at 21 n.19.

[4] ***Brady v. Maryland***, 373 U.S. 83, 86-89 (1963), held that a prosecution's withholding of information or evidence that is favorable to a criminal defendant's case violates the defendant's due-process rights and that the prosecution has a duty to disclose such information or evidence.

[5] Assuming, for argument's sake, that Appellant had preserved a *Brady* challenge, we would agree with the trial court that no *Brady* violation

*(Footnote Continued Next Page)*

Here, Appellant appears to be arguing that the prosecution committed misconduct by presenting a different argument to the trial court in response to a post-trial motion than it did to the jury during trial. Appellant's Brief at 35-37.

"Prosecutorial misconduct occurs where the unavoidable effect of the prosecutor's actions is to prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict." ***Commonwealth v. Graham***, 109 A.3d 733, 736 (Pa. Super. 2015).

The prosecutor's actions that Appellant is challenging occurred post-trial. Thus, they could not have possibly prejudiced the jury, which was no longer involved in the case. ***See Graham***, 109 A.3d at 736. Hence, Appellant's claim of prosecutorial misconduct is meritless.

## Jury Instruction

Finally, Appellant argues that the trial court --

> erred in giving a progression charge when it instructed the jury as to how the various charges of homicide should be considered.

*(Footnote Continued)* ————————

occurred. ***See*** TCO at 13. The trial court opinion comprehensively discusses and properly disposes of that question. ***See id.*** at 19-20 (finding: Appellant claims a ***Brady*** violation occurred, because the Commonwealth may have known the blood at the scene came from Hall; however, "[i]n the present case, the Commonwealth did not suppress evidence regarding the source of blood because there was no DNA testing conducted to make such a determination"; and "Appellant was provided with equal access to the evidence so he could have uncovered the source of the blood with reasonable diligence").

- 15 -

. . . [G]iven the fact that the jury returned with a verdict in about one and one-half hours after a nine-day trial, it appears clear that the jury did not consider all the charges and particularly the defenses in the case, especially given how the progression is worded.

Appellant's Brief at 49.

When reviewing the adequacy of a jury instruction, the Supreme Court of Pennsylvania has instructed that "we must consider the charge in its entirety to determine if it is fair and complete. The trial court has broad discretion in phrasing the charge and the instruction will not be found in error if, taken as a whole, it adequately and accurately set forth the applicable law." *Commonwealth v. Daniels*, 963 A.2d 409, 430 (Pa. 2009) (citations omitted).

The trial court held that Appellant's challenge to the "progression charge" was waived, because he did not object to it during the charge conference. TCO at 27. We disagree. At the charge conference, defense counsel believed that the trial court was going to give the 2007 version of the criminal homicide finding lesser type instruction, which did not contain the "progression" language at issue; thus, defense counsel had no reason to object at the charge conference. Additionally, according to Pa.R.Crim.P. 647(C): "No portions of the charge or admissions from the charge may be assigned as error, unless specific objections are made thereto **before the jury retires to deliberate**" (emphasis added). Here, defense counsel did place its objection on the record before the jury retired to deliberate, N.T.

- 16 -

Trial at 2406, and the objection was thus preserved. Pa.R.Crim.P. 647(C). In its opinion, the trial court also asserted that the issue is waived "where trial Counsel does not object when the misstatement could have been corrected." TCO at 28 (citing **Commonwealth v. Brown**, 134 A.2d 1097, 1108 (Pa. Super. 2016)). However, since the jury had not yet begun its deliberations when defense counsel objected, the alleged misstatement could have been corrected. **Brown**, 134 A.2d at 1108; N.T. Trial at 2406. For these reasons, we find that Appellant did not waive his challenge to the criminal homicide finding lesser type instruction and will consider the merits of his claim.[6]

This Court has previously, repeatedly determined that, as a general rule, progression charges are proper in homicide cases. **Commonwealth v. Loach**, 618 A.2d 463, 464-66, 468-70 (Pa. Super. 1992) (*en banc*); **Commonwealth v. duPont**, 730 A.2d 970, 985 (Pa. Super. 1999); **Commonwealth v. Sneeringer**, 668 A.2d 1167, 1170 (Pa. Super. 1995); **Commonwealth v. Hart**, 565 A.2d 1212, 1217 (Pa. Super. 1989).

For example, in **Hart**, this Court affirmed the following charge:

[I]f you find the Defendant guilty of murder of the first degree, it will not then be necessary to consider second degree, third degree or voluntary manslaughter. . . . If you find him guilty of

---

[6] "This Court is not bound by the rationale of the trial court, and we may affirm the trial court on any basis." **Commonwealth v. Williams**, 73 A.3d 609, 617 n.4 (Pa. Super. 2013) (citing **In re Jacobs**, 15 A.3d 509, 509 n.1 (Pa. Super. 2011)).

first degree murder, it will not be necessary to consider any of the other charges.

If you find him not guilty of first degree but find him guilty of second degree, then the chairperson should write beside that charge guilty. It will not be necessary to consider third degree and manslaughter. . . .

You will only consider voluntary manslaughter if you are satisfied the Commonwealth has not proven the Defendant guilty of any degrees of murder.

*Id.* at 1214 (emphasis omitted) (citation to the record omitted). This Court

*en banc* re-considered such a progression charge in **Loach** and approved of

the following jury charge:

[I[f you find the Defendant guilty of murder of the first degree, you do not then go on to consider murder of the third degree or voluntary manslaughter. If, however, you find the Defendant not guilty of murder in the first degree, then you would go on to consider murder of the third degree. If you find him guilty of murder of the third degree, you don't go on to consider voluntary manslaughter.

If you find him not guilty of murder in the third degree, then you would go on to consider voluntary manslaughter and make that determination, guilty or not guilty.

618 A.2d at 465 (citation to the record omitted).

The language quoted above from **Hart** and **Loach** is analogous to the

contested jury instruction in the current matter:

If . . . you find the Commonwealth has not proven all of the elements of first degree murder beyond a reasonable doubt, you must find the defendant not guilty of that charge and go on to consider the next most serious type of homicide charged in this case, that being third degree murder.

. . .

If you find the defendant guilty of that charge, you do not need to consider a verdict on any of the lesser degrees of homicide

that I have defined for you, including voluntary or involuntary manslaughter.

If, however, you find the Commonwealth has not proven all of the elements of third degree murder beyond a reasonable doubt, you must find the defendant not guilty of that charge and then go on to consider the most – next most serious type of homicide, namely voluntary manslaughter.

. . .

If you find the defendant guilty of that charge, you do not consider involuntary manslaughter.

If, however, you find the Commonwealth has not proven all the elements of voluntary manslaughter beyond a reasonable doubt, you must then find the defendant not guilty of voluntary manslaughter and go on to consider the elements of involuntary manslaughter.

N.T. Trial at 2399-2400.[7]  As this Court has sanctioned similarly worded jury instructions before, we normally would find no abuse of discretion by the trial court in giving said instruction.  *See Daniels*, 963 A.2d at 430; *Loach*, 618 A.2d at 464-66, 468-70; *Hart*, 565 A.2d at 1214, 1217.

_____

[7] Moreover, Appellant's contention that, "when it gave this progression charge, the [trial c]ourt did not include involuntary manslaughter" is contradicted by these notes of testimony.  N.T. Trial at 2400 ("If you find the defendant guilty of [voluntary manslaughter], you do not consider involuntary manslaughter.  If, however, you find the Commonwealth has not proven all the elements of voluntary manslaughter beyond a reasonable doubt, you must then find the defendant not guilty of voluntary manslaughter and **go on to consider the elements of involuntary manslaughter**." (emphasis added)).  Furthermore, the trial court had defined involuntary manslaughter in detail earlier in the instructions.  *Id.* at 2390-91 (including three elements of offense, definitions of "reckless or grossly negligent" conduct, and that all relevant facts and circumstances must be considered when determining if conduct is reckless or grossly negligent).

However, this Court has also cautioned:

Whenever the trial judge gives a progression charge in a homicide case, he should accompany the charge with an instruction that makes clear to the jurors that they must take any evidence of "heat of passion" or "unreasonable belief" into account when initially determining whether the Commonwealth has established the malice element of murder beyond a reasonable doubt. Without proper instructions regarding malice, the jury might misinterpret the progression charge as mandating a conviction for murder despite the presence of mitigating evidence establishing "heat of passion" or "unreasonable belief".

*Id.* at 1217–18 (footnote omitted).

Here, the trial court gave an instruction clarifying to the jury that it must take any evidence of heat of passion or unreasonable belief into account. N.T. Trial at 2386-89 (quoted above). As a thorough and accurate instruction on heat of passion and unreasonable belief was given by the trial court, the inclusion of the progression charge thus was permissible. *See Hart*, 565 A.2d at 1217–18.

As for Appellant's argument that the fact that the jury returned a verdict after deliberating for only about ninety minutes indicated that the jury "did not consider all the charges and particularly the defenses in the case," Appellant's Brief at 49, we find no case law – and Appellant provides none – where a verdict is reversed, because the duration of the jury deliberations was too short. The question of the proper duration of jury deliberations is one that rests within the sound discretion of the trial court, whose decision will not be disturbed unless there is a showing that the court abused its discretion or that the jury's verdict was the product of coercion or

- 20 -

fatigue, neither of which Appellant claims here. Pa.R.Crim.P. 648(A); *Commonwealth v. Greer*, 951 A.2d 346 (Pa. 2008).

As for Appellant's allegation that "the jury did not consider all the charges and particularly the defenses in the case," Appellant's Brief at 49, we acknowledge that, in "exercising our supervisory power, we direct our trial judges to adopt and enforce procedures in all homicide cases which will prevent the recording of a jury verdict of not guilty on lesser included degrees of homicide when the jury returns a guilty verdict on a higher degree." *Commonwealth v. Terry*, 521 A.2d 398, 410 (Pa. 1987). Pursuant to *Terry*, *id.*, the trial court's instruction that the jury need not consider the lesser degrees of criminal homicide once it had determined that Appellant was guilty of some form of criminal homicide was proper, N.T. Trial at 2398-2401, because it prevented the possibility of the jury recording a verdict of not guilty on either of the lesser degrees of homicide after it had returned a guilty verdict on murder of the third degree.

Thus, after considering the jury instructions in their entirety, we determine that they are fair and complete and accurately set forth the applicable law. *Daniels*, 963 A.2d at 430 (Pa. 2009). For these reasons, Appellant's final challenge merits no relief.

### Sentencing

"[I]t is well settled that this Court may address the legality of a sentence *sua sponte*." *Commonwealth v. McCamey*, 154 A.3d 352, 357

(Pa. Super. 2017) (citing **Commonwealth v. Infante**, 63 A.3d 358, 363 (Pa. Super. 2013)). "When reviewing the legality of a sentence, our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Seskey**, 170 A.3d 1105, 1107 (Pa. Super. 2017).

Here, the trial court sought to impose restitution as part of Appellant's direct sentence, as evidenced by the court's reliance on 18 Pa.C.S. § 1106. **See** TCO at 32-34.[8] As our Supreme Court has explained:

> [R]estitution must properly be included in a sentence. **Commonwealth v. Dinoia**, 801 A.2d 1254, 1257 n.1 (Pa. Super. 2002); **Commonwealth v. Torres**, 579 A.2d 398, 401 (Pa. Super. 1990). Section 1106(c)(2) provides that "[a]t the time of sentencing the court shall specify the amount and method of restitution." 18 Pa.C.S. § 1106(c)(2). Further, "[i]t shall be the responsibility of the district attorneys of the respective counties to make a recommendation to the court at or prior to the time of sentencing as to the amount of restitution to be ordered; ... based upon information solicited by the district attorney and received from the victim." **Id**., [18 Pa.C.S.] § 1106(c)(4)(i). In **Dinoia**, the Superior Court held these requirements "provide[ ] the defendant with certainty as to his sentence, and at the same time allow[ ]for subsequent modification [pursuant to § 1106(c)], if necessary." **Dinoia**, at 1257.

---

[8] Restitution is authorized under both the Crimes Code and under the Sentencing Code. The Crimes Code, in 18 Pa.C.S. § 1106, controls restitution as a direct sentence. The Sentencing Code, in 42 Pa.C.S. § 9754, permits a sentence of probation and offers a non-exclusive list of permissible conditions of probation, including restitution.

**Commonwealth v. Deshong**, 850 A.2d 712, 715–16 (Pa. Super. 2004).

*Commonwealth v. Dietrich*, 970 A.2d 1131, 1134 (Pa. 2009) (some formatting added). Failure to comply with Section 1106(c)(2) results in an illegal sentence. *Commonwealth v. Mariani*, 869 A.2d 484, 485-86 (Pa. Super. 2005) (invalidating trial court's order at the sentencing hearing which failed to specify both the amount and method of restitution and postponed determining same until after sentencing hearing); *Commonwealth v. Deshong*, 850 A.2d 712, 715–16 (Pa. Super. 2004) (citing *Commonwealth v. Dinoia*, 801 A.2d 1257, 1257 n.1 (Pa. Super. 2002)) (same); *Commonwealth v. Torres*, 579 A.2d 398, 401 (Pa. Super. 1990) (same). Rather than setting the amount and method of restitution at the time of sentencing, the trial court ordered a subsequent hearing to determine the amount of restitution due. As the trial court failed to comply with Section 1106(c)(2), Appellant's sentence is illegal. *Mariani*, 869 A.2d at 486-87 ("[T]he illegality of one part invalidates the whole."). When a disposition by an appellate court alters the sentencing scheme, the entire sentence should be vacated, and the matter remanded for resentencing. *Deshong*, 850 A.2d at 714 (citing *Commonwealth v. Goldhammer,* 517 A.2d 1280 (Pa. 1986); *Commonwealth v. Farone,* 808 A.2d 580 (Pa. Super. 2002)). Accordingly, we vacate the judgment of sentence and remand for resentencing in compliance with 18 Pa.C.S. § 1106(c).

Judgment vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/2/2018